**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:     Justices:
Clifford W. Taylor     Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

FILED APRIL 2, 2008

LIBERTY HILL HOUSING
CORPORATION,

      Petitioner-Appellant,

v                                   No. 131531

CITY OF LIVONIA,

      Respondent-Appellee.

BEFORE THE ENTIRE BENCH

CORRIGAN, J.

Petitioner, a nonprofit organization, leased housing to disabled and low-income individuals during the tax years at issue. In question is whether petitioner was entitled to a property-tax exemption for charitable institutions under MCL 211.7o(1), which requires that the charitable institution has "occupied" the property. We affirm the Court of Appeals holding that because petitioner did not occupy the property under the unambiguous language of MCL 211.7o, it was not entitled to the property-tax exemption. Petitioner did not maintain a regular physical presence on the property, but instead leased the housing on the property for tenants to use for their own personal purposes. Because the Court of Appeals

reached the opposite result in *Pheasant Ring v Waterford Twp*, 272 Mich App 436; 726 NW2d 741 (2006), which involved similar facts, we overrule that decision.

## I.  FACTS AND PROCEDURAL HISTORY

Petitioner is a nonprofit corporation whose stated purpose is to "creat[e] integrated housing alternatives for low income individuals and families, and persons with disabilities, to interact with the general public, and to promote the establishment of safe, affordable and accessible as necessary housing for low-income individuals and families and persons with disabilities."[1]  Petitioner owns 51 single-family homes in the Detroit area.  It leases or rents these homes to qualified individuals who are referred by its parent corporation, Community Living Services.[2]  Petitioner's clients are individuals whose low-income or disability status qualify them to receive federal Supplemental Security Income benefits.  All of petitioner's tenants pay rent under traditional written leases.  These lease agreements include provisions for security deposits, late-payment fees, and hold-over fees.  Petitioner has no ongoing day-to-day presence in the homes.

---

[1] Although petitioner's goal is to break even while providing necessary housing and services to its clients, petitioner had operated at a deficit for the three years preceding this suit.

[2] Community Living Services provides the clients with additional services, such as transportation, meals, monitoring, medical assistance, repairs, maintenance, and social activities.

At issue in this case are five houses that petitioner owned and leased to persons who qualified under petitioner's statement of purpose. Petitioner requested from respondent city of Livonia an exemption from property taxes under MCL 211.7o(1) for tax years 2003 and 2004, arguing that the five houses were exempt because petitioner "owned and occupied" the houses in furtherance of its charitable purpose. After respondent denied petitioner's request, petitioner appealed in the Michigan Tax Tribunal (MTT).

The MTT affirmed, concluding that petitioner was not entitled to the property-tax exemption because petitioner did not occupy the houses within the meaning of MCL 211.7o(1). The MTT observed that the caselaw interpreting the occupancy requirement of MCL 211.7o(1) had held that a charitable institution "occupied" the housing when its provision of housing was incidental to the overall corporate purpose. The MTT pointed out that, in this case, petitioner's tenants were not using the homes for charitable purposes. The MTT concluded that petitioner did not occupy the properties under MCL 211.7o for the following reasons:

> To say that Liberty Hill occupies the properties in these instances where Liberty Hill lessees reside at the subject properties does not comport with the plain meaning of the statute. In a landlord-tenant relationship, the lessee is generally considered the occupant and the lessor does not generally have occupancy rights during the term of the lease. See *Frenchtown Villa v Meadors*, 117 Mich App 683[324 NW2d 133] (1982).

> In this case, involving single family homes, it is a significant stretch to say that the non-profit [sic] corporate owner/lessor

3

occupies the properties by virtue of leasing them to tenant occupants consistent with the non-profit's [sic] corporate purposes.

In these consolidated cases, while Liberty Hill, a nonprofit charitable institution, owns the properties, it does not occupy any of them. The exemption is apparently meant for instances where the offices and operations of the non-profit [sic] charitable institution exist.

The Court of Appeals affirmed in an unpublished opinion per curiam. The panel explained that it agreed with the MTT's reasoning and conclusion:

The tribunal's opinion points out that in a landlord-tenant relationship, the lessee is the *occupant* while the lessor, here petitioner, does not have occupancy rights during the terms of the lease. Further, to find that the non-profit [sic] corporate owner/lessor *occupies* the properties by virtue of leasing them to tenant-occupants, even though the tenancy is consistent with the non-profit's [sic] corporate purposes, requires a "significant stretch". We agree. [*Liberty Hill Housing Corp v City of Livonia*, unpublished opinion per curiam of the Court of Appeals, issued May 16, 2006 (Docket No. 258752), p 2 (emphasis in original).]

The panel concluded that petitioner did not occupy the properties that it leased to tenants for the tenants' personal housing needs.

While petitioner's application for leave to appeal the Court of Appeals decision was pending, the Court of Appeals decided *Pheasant Ring,* in which it held that the petitioner charitable institution "occupied" property under MCL 211.7o(1) when it leased housing to tenants in furtherance of its charitable purpose of providing housing to individuals with autism. No appeal was taken from the Court of Appeals decision in *Pheasant Ring*.

To clarify whether a charitable institution that leases property to others in furtherance of its charitable purpose occupies the property for purposes of the

4

property-tax exemption under MCL 211.7o(1), we ordered oral argument on the application in the instant case and directed the parties to address whether *Pheasant Ring* was correctly decided.  477 Mich 1018 (2007).

## II.  STANDARD OF REVIEW

In *Wexford Med Group v City of Cadillac*, 474 Mich 192, 201; 713 NW2d 734 (2006), this Court described the standard of review for MTT decisions as follows:

> The standard of review for Tax Tribunal cases is multifaceted.  Where fraud is not claimed, this Court reviews the tribunal's decision for misapplication of the law or adoption of a wrong principle.  *Michigan Bell Tel Co v Dep't of Treasury*, 445 Mich 470, 476; 518 NW2d 808 (1994).  We deem the tribunal's factual findings conclusive if they are supported by "competent, material, and substantial evidence on the whole record."  *Id.*, citing Const 1963, art 6, § 28 and *Continental Cablevision v Roseville*, 430 Mich 727, 735; 425 NW2d 53 (1988).  But when statutory interpretation is involved, this Court reviews the tribunal's decision de novo.  *Danse Corp v Madison Hts*, 466 Mich 175; 644 NW2d 721 (2002).

This Court has held that statutes exempting persons or property from taxation must be narrowly construed in favor of the taxing authority.  See, e.g., *Wexford, supra* at 204.

## III.  LEGAL BACKGROUND

### A.  MCL 211.7o

The statute at issue, MCL 211.7o, creates an ad valorem property-tax exemption for charitable institutions.  *Wexford Med Group, supra* at 199.  At the relevant times, MCL 211.7o(1) provided: "Real or personal property *owned and*

*occupied* by a nonprofit charitable institution while *occupied* by that nonprofit charitable institution solely for the purposes for which it was incorporated is exempt from the collection of taxes under this act." (Emphasis added.)[3] As a consequence of the statutory requirements, courts should consider three factors when determining whether the tax exemption under MCL 211.7o(1) applies:

> (1) The real estate must be *owned and occupied* by the exemption claimant;

> (2) the exemption claimant must be a nonprofit charitable institution; and

> (3) the exemption exists only when the buildings and other property thereon are *occupied by the claimant solely for the purposes for which it was incorporated.* [*Wexford Med Group, supra* at 203 (emphasis added).]

Here, it is undisputed that petitioner owned the properties at issue. The main point of contention is whether petitioner "occupied" the properties.

## B. CASELAW INTERPRETATIONS

Petitioner argues that this Court, in analyzing the exemption under MCL 211.7o(1) and its predecessors, has construed "occupation" to mean "charitable use" and has not required physical possession by the exemption claimant. In making this argument, petitioner relies on cases that interpreted the third element of MCL 211.7o(1), that the property be occupied *solely for a charitable purpose*,

---

[3] MCL 211.7o(1) was last amended by 2006 PA 681. It now provides: "Real or personal property owned and occupied by a nonprofit charitable institution while occupied by that nonprofit charitable institution solely for the

(continued…)

6

and not the first element, that the real estate must be *owned and occupied* by the claimant. A review of this Court's caselaw yields no support for petitioner's argument.

Our first case addressing the occupation requirement of Michigan's statutory tax exemption for nonprofit institutions was *Detroit Young Men's Society v Detroit*, 3 Mich 172 (1854).[4] In that case, the plaintiff was incorporated "for the purpose of moral and intellectual improvement" and owned a building in the city of Detroit that included a library. *Id.* at 180. The plaintiff offered for rent by third parties two stores on the first floor and two small offices on the second floor, but the "remainder of the building . . . was used entirely for the purposes of the society . . . ." *Id.* at 173 (opinion syllabus). Because the 1853 statute required "actual[]" occupation by the institution,[5] this Court held that the occupation must be

---

(…continued)
purposes for which that nonprofit charitable institution was incorporated is exempt from the collection of taxes under this act."

[4] 1853 PA 86, § 5(8) exempted from taxation the "personal property of all library, benevolent, charitable and scientific institutions, incorporated within this State, and such real estate belonging to such institutions as shall actually be occupied by them, for the purposes for which they were incorporated[.]"

[5] The Legislature later amended the statute to remove the word "actually." See 1885 PA 153, § 3, providing a tax exemption for the personal property of "library, benevolent, charitable, and scientific institutions, incorporated under the laws of this State, and such real estate as shall be occupied by them for the purposes for which they were incorporated[.]" This statute was amended a few years later by 1893 PA 206 to provide a tax exemption for "[s]uch real estate as shall be owned and occupied by library, benevolent, charitable, educational and scientific institutions incorporated under the laws of this State, with the buildings and other property thereon, while occupied by them solely for the purposes for
(continued…)

exclusive and ruled that the property was subject to taxation, "subject to a deduction of the value of the tenements actually used and occupied by them for the purposes for which they were incorporated, from the entire value of the lot and building." *Id.* at 184.

In *Webb Academy v Grand Rapids*, 209 Mich 523, 525; 177 NW 290 (1920), the plaintiff, an incorporated educational institution, sought a property-tax exemption for educational institutions.[6] The plaintiff conducted school business on the property, but the founder of the school and his wife, a teacher at the school, lived on the property, along with a student who helped with upkeep in exchange for room and board. *Id.* at 532-533. This Court indicated that the "owned and occupied" element of the exemption statute was not at issue when it noted: "That plaintiff was in full possession and control of the premises, and maintained an academy there, is not questioned." *Id.* at 535. It then agreed with the trial court that the property was occupied by the educational institution solely for the purposes for which it was incorporated and that the other minor uses, such as

---

(…continued)
which they were incorporated . . . ." Thus, although the statute no longer stated that "actual[]" occupancy was required, it did require that the property be both "owned and occupied" by charitable institutions and "occupied by them solely for the purposes for which they were incorporated."

[6] *Webb Academy* involved another predecessor of MCL 211.7o, 1915 CL 4001, that, in language essentially identical to that of 1893 PA 206, exempted from taxation "[s]uch real estate as shall be owned and occupied by library, benevolent, charitable, educational and scientific institutions incorporated under
(continued…)

8

housing incidental to the school uses, did not defeat that conclusion. *Id.* at 539. Thus, this Court's decision focused on whether the property was occupied *solely for the purposes for which the plaintiff was incorporated,* not on whether actual occupancy was required to qualify for an exemption.

Likewise, in *Gull Lake Bible Conference Ass'n v Ross Twp*, 351 Mich 269, 273; 88 NW2d 264 (1958), this Court noted that there was no dispute about whether the plaintiff owned or occupied the property. In that case, the plaintiff's stated purpose was "[t]o promote and conduct gatherings at all seasons of the year for the study of the Bible and for inspirational and evangelistic addresses." *Id*. at 271. The plaintiff sought a property-tax exemption for charitable organizations.[7] Besides a tabernacle and youth chapel (for which the tax-exempt status was not contested), the property included an old hotel building used to house employees, a fellowship center building, a trailer campsite for persons attending the conference and living in trailers, cottages that were rented to persons attending the conference, a gravel pit, a picnic area, boat docks, a bathhouse, a beach, a playground,

_____

(…continued)
the laws of this state, with the buildings and other property thereon while occupied by them solely for the purposes for which they were incorporated[.]"

[7] *Gull Lake* involved another predecessor of MCL 211.7o that exempted from taxation

> [s]uch real estate as shall be owned and occupied by library, benevolent, charitable, educational or scientific institutions and memorial homes of world war veterans incorporated under the laws of this state with the buildings and other property thereon while
>
> (continued…)

9

horseshoe and badminton courts, and parking areas. *Id.* at 272. This Court determined that the housing and recreational facilities on the property were necessary to fulfill the plaintiff's purpose. *Id.* at 275. Again interpreting the third element of the tax-exemption statute, this Court held that the property was occupied by the plaintiff solely for the purpose for which it was incorporated. *Id.* at 274-275.

Finally, in *Oakwood Hosp Corp v State Tax Comm*, 374 Mich 524, 526; 132 NW2d 634 (1965) *(Oakwood Hosp I)*, the plaintiff was a nonprofit corporation that owned and operated a hospital. The plaintiff claimed a tax exemption for property on which its hospital facilities were located.[8] *Id.* Also on the property were six houses that provided housing near the hospital for the resident physicians and interns whose services and availability to the hospital at all times were essential to the operation of the hospital. *Id.* at 527. This Court held that the plaintiff was entitled to the tax exemption for the entire property, including the houses. This Court explained that housing the doctors and interns near the hospital was necessary to the proper functioning of the hospital. *Id.* at 530. Therefore, the houses were "occupied in furtherance of and for the purposes

---

(…continued)
occupied by them solely for the purposes for which they were incorporated. [MCL 211.7, as amended by 1955 PA 46.]

[8] At the time *Oakwood Hosp I* was decided, the pertinent statutory language was identical to that in effect when *Gull Lake* was decided. See MCL 211.7, as amended by 1961 PA 238.

for which plaintiff was incorporated and for hospital and public health purposes."

*Id.*[9] Thus, this Court was again called on to address the third element of the tax-exemption statute: whether the property was occupied for the purposes for which the claimant was incorporated. This Court simply did not address the first element: whether the property was "owned and occupied."[10]

## C. *PHEASANT RING v WATERFORD TWP*

Five months after the Court of Appeals issued its opinion in the instant case, the Court of Appeals decided *Pheasant Ring*. In *Pheasant Ring, supra* at 440, the petitioner was a nonprofit corporation organized to carry on educational

---

[9] Later, in *Oakwood Hosp Corp v State Tax Comm*, 385 Mich 704; 190 NW2d 105 (1971) (*Oakwood Hosp II*), this Court reached the opposite conclusion because the Legislature had amended the statute to specifically exclude such physician housing from the property-tax exemption.

[10] Since *Oakwood Hosp II*, the Court of Appeals has addressed the tax exemption at issue several times. See, e.g., *Lake Louise Christian Community v Hudson Twp*, 10 Mich App 573, 580; 159 NW2d 849 (1968) (holding that the religious institution did not occupy 1,300 acres of mostly unused wooded property because the property was not frequently used for religious education), *Nat'l Music Camp v Green Lake Twp*, 76 Mich App 608, 612; 257 NW2d 188 (1977) (holding that the nonprofit educational institutions were entitled to a property-tax exemption for 92 acres of unspoiled sand dunes on Lake Michigan because "[t]he property was used in a manner consistent with the nature of the land in such a way that the purpose for which the owning institution is exempt, education, was plainly advanced"), *Kalamazoo Nature Ctr, Inc v Cooper Twp*, 104 Mich App 657, 665-667; 305 NW2d 283 (1981) (holding that the nonprofit institution "occupied" 31 acres of preserved wilderness land that it did not physically enter but used for observation and educational purposes), and *Holland Home v Grand Rapids*, 219 Mich App 384, 397-398; 557 NW2d 118 (1996) (holding that the nonprofit association did not occupy the property when a retirement home on the property was under construction on the relevant tax days). The validity of some of these opinions is questionable in light of our holding in the instant case.

11

and other charitable activities, including establishing and supporting a transitional community for persons with autism. The petitioner sought a property-tax exemption for a building that it owned and rented to persons with autism. *Id.* at 441-442. Nothing in the Court of Appeals opinion stated that any of the petitioner's employees resided in the building to supervise or monitor the tenants. Nonetheless, the Court of Appeals held that the petitioner "occupied" the home within the meaning of MCL 211.7o(1). The Court looked to the dictionary definition of "occupy" and then, without discussing *Detroit Young Men's Society*, *Webb Academy*, *Gull Lake*, or *Oakwood Hosp I*, held that the petitioner "occupied" the building because it used the building in furtherance of its charitable purpose. The panel held, in pertinent part:

> The Township asserts that Pheasant Ring does not occupy the property because the location of its offices is not physically on the property at issue and it rents the property to tenants. This interpretation of the requirements for tax exemption is too narrow and restrictive. There is no dispute that Pheasant Ring owns the property. Although Pheasant Ring does not use the property for its own offices, the property is occupied by tenants of Pheasant Ring in furtherance of its charitable purposes. This Court, in determining whether a charitable organization "occupied" a property for purposes of qualifying for a tax exemption, has determined that "[t]he proper test is whether the entire property was used in a manner consistent with the purposes of the owning institution." *Holland Home v Grand Rapids*, 219 Mich App 384, 398; 557 NW2d 118 (1996). Under this criterion, Pheasant Ring occupied the residence. [*Pheasant Ring, supra* at 442.]

IV. ANALYSIS

We conclude that under the plain language of MCL 211.7o(1) and this Court's previous caselaw, the Court of Appeals correctly decided this case and incorrectly decided *Pheasant Ring*.

First, the Court of Appeals opinion in the instant case is consistent with the statutory language, whereas *Pheasant Ring* is not. *Webster's Universal College Dictionary* (1997) defines "occupy" as follows:[11]

> —*v.i.* 1. to have, hold, or take as a separate space; possess, reside in or on, or claim: *The orchard occupies half the farm.* 2. to be a resident or tenant of; dwell in. 3. to fill up, employ, or engage: *to occupy time reading.* 4. to engage or employ the mind, energy, or attention of: *We occupied the children with a game.* 5. *to* take possession and control of (a place), as by military invasion. —*v.i.* 6. to take or hold possession.

We conclude that the second meaning is the one the Legislature intended. The third, fourth, and fifth meanings in the definition are clearly not relevant here.[12]

---

[11] Justice Cavanagh attacks our use of a dictionary in interpreting the statutory language. He states: "The practice of reaching for a dictionary to define common words in a statute risks serving to merely confirm the writer's assumed meaning of the word, rather than to actually advance the writer's legal analysis." *Post* at 3. We recognize that dictionaries are merely interpretive aids used by the court. *Consumers Power Co v Pub Service Comm*, 460 Mich 148, 163 n 10; 596 NW2d 126 (1999). But in a previous opinion authored by Justice Cavanagh, this Court held: "When determining the common, ordinary meaning of a word or phrase, consulting a dictionary is appropriate." *Title Office, Inc v Van Buren Co Treasurer*, 469 Mich 516, 522; 676 NW2d 207 (2004).

[12] Although the dissent accuses us of cursorily dismissing three of the alternative meanings of "occupy," we see no need to discuss these definitions in detail because they clearly do not apply. The dissent seems to prefer the third meaning in the definition: "to fill up, employ, or engage; *to occupy time reading.*" But the dictionary's example using this meaning clearly demonstrates that the

(continued…)

The first meaning defines "occupy" as "to have, hold, . . . possess, . . . or claim." These parts of the definition are synonymous with ownership.[13] Because the statute uses the conjunctive term "owned *and* occupied," however, the Legislature must have intended different meanings for the words "owned" and "occupied." Otherwise, the word "occupied" would be mere surplusage. "Courts must give effect to every word, phrase, and clause in a statute, and must avoid an interpretation that would render any part of the statute surplusage or nugatory." *Koontz v Ameritech Services, Inc*, 466 Mich 304, 312; 645 NW2d 34 (2002). Thus, the Legislature must have intended the term "occupy" to mean the other aspect of the dictionary definition: to "reside in or on" or "to be a resident or tenant of; dwell in." This aspect of the definition especially makes sense when viewed in its specific context;[14] it is "real or personal property" that must be

---

(…continued)

third meaning does not make sense in the context of the statute. One cannot "fill up" property the way one can fill up time reading. The fourth meaning does not apply because one cannot "engage or employ the mind, energy, or attention of" an inanimate object such as real property. Finally, it is preposterous to suggest that the Legislature intended the exemption to apply only if a nonprofit charitable institution conducted a successful military invasion of the property.

[13] *Webster's Universal College Dictionary* (1997) defines "own" as "to have or hold as one's own; possess."

[14] A word that is defined in various ways is given meaning by its context or setting. *Koontz, supra* at 318.

"occupied." "Reside" means "1. to dwell permanently or for a considerable time; live. 2. (of things, qualities, etc.) to be present habitually; be inherent ([usually followed] by *in*)." *Webster's Universal College Dictionary* (1997). Thus, aided by this dictionary definition, we conclude that to occupy property under MCL 211.7o(1), the charitable institution must at a minimum have a regular physical presence on the property.[15]

Using this definition, the Court of Appeals in the instant case correctly held that petitioner did not occupy property that it leased to others and did not physically reside in.[16] In this situation, the tenants, not petitioner, actually "occupied" the property. We agree with the Court of Appeals that "to find that the non-profit [sic] corporate owner/lessor *occupies* the properties by virtue of leasing them to tenant-occupants, even though the tenancy is consistent with the non-profit's [sic] corporate purposes, requires a 'significant stretch'." *Liberty Hill*, *supra* at 2 (emphasis in original.) The *Pheasant Ring* panel's holding that a nonprofit corporation occupies a property merely by virtue of the fact that the

---

[15] A charitable institution does not automatically occupy property if it has occupancy rights to the property. The term "occupy" requires more than merely having the "right to occupy." As we have explained, the charitable institution must actually occupy the property, i.e., maintain a regular physical presence there.

[16] Petitioner is correct, however, that the fact that it charged the tenants rent does not disqualify it from the exemption. See *Wexford Med Group, supra* at 215 ("A 'charitable institution' can charge for its services as long as the charges are not more than what is needed for its successful maintenance.").

15

property is being used in a manner consistent with the corporation's purpose is at odds with the statute's plain language.

The Court of Appeals holding in the instant case is further supported by this Court's decisions in *Webb Academy, Gull Lake*, and *Oakwood Hosp I*. Although those decisions did not focus on the occupancy requirement of the statute, but focused instead on the part of the statute requiring that the property be occupied "solely for the purposes for which it was incorporated," the plaintiffs in those cases were actually physically present on the property when they engaged in activities that carried out their nonprofit goals. Here and in *Pheasant Ring*, on the other hand, the petitioners were not present on the property.

## V. RESPONSE TO THE DISSENT

The dissent and petitioner incorrectly conclude that the term "occupy" is synonymous with "use."[17] In arguing that "occupy" means "use," the dissent selectively quotes the fifth of five suggested meanings of "occupancy" in Black's Law Dictionary (8th ed).[18] The first definition of "occupancy" suggested,

---

[17] Similarly, the Court of Appeals in *Lake Louise Christian, supra* at 578, and *Kalamazoo Nature Ctr, supra* at 665-667, erred in concluding that "occupy" is synonymous with "use."

[18] Justice Cavanagh's dissent states that it quotes Black's Law Dictionary merely "to draw attention to the inadequacy of a dictionary-driven approach to statutory interpretation." *Post* at 3. Yet Justice Cavanagh does not explain what interpretive aid, other than his own personal vocabulary, he would prefer us to use to define the statutory term. Further, when it comes to actually interpreting the statutory language, Justice Cavanagh, despite his criticism of our reliance on a dictionary, himself turns to the dictionary definition. The dissent states that the

(continued…)

16

however, reads: "The act, state, or condition of holding, possessing, or residing in or on something; actual possession, residence, or tenancy, [*especially*] *of a dwelling or land*." *Id*. (emphasis added). This definition is consistent with the first two meanings of "occupy" suggested in *Webster's Universal College Dictionary* (1997), one of which we adopt today.

We reject the dissent's argument that interpreting "occupied" to mean "reside[d] in or on" is incongruous with the Legislature's second use of "occupied" in MCL 211.7o(1). Contrary to the dissent's argument, a charitable institution may reside on property for charitable purposes, rather than simply dwelling on the property for no reason other than dwelling itself. For example, the doctors and interns in *Oakwood Hosp I* resided in physicians' housing "in furtherance of and for the purposes for which plaintiff was incorporated and for hospital and public health purposes." *Oakwood Hosp I, supra* at 530.

The dissent argues that charitable institutions do not typically reside in a place because they are inanimate. Clearly, just as inanimate things may not "use" property, they may not "reside" on property. Charitable institutions, however, are not merely inanimate bodies; they are made up of people. A charitable institution's members, employees, or volunteers may dwell on the property or at

___

(…continued)
term "'occupied' should be understood as synonymous with 'used,' because it is the most appropriate definition for that context." *Post* at 5. Justice Cavanagh appears to derive this definition from Black's Law Dictionary, which he quotes earlier in his opinion.

17

least be habitually present on the property, which is consistent with the meaning of "reside." The dissent contends that a charitable institution may not "reside in" certain property, such as a swimming pool. Although one obviously cannot dwell in a swimming pool, one can maintain a regular physical presence at the pool (e.g., by habitually swimming there) or on the property that contains the pool. Either would generally be sufficient to occupy the property.

In citing *Oakwood Hosp I* to support its argument that the term "occupied" means "used," the dissent conflates the following two factors for determining whether the tax exemption under MCL 211.7o(1) applies:

> (1) The real estate must be owned and occupied by the exemption claimant;
>
> &ast; &ast; &ast;
>
> (3) the exemption exists only when the buildings and other property thereon are occupied by the claimant solely for the purposes for which it was incorporated. [*Wexford Med Group, supra* at 203.]

As discussed, the *Oakwood Hosp I* Court addressed *only* the third factor. The Court held that the nonprofit corporation occupied physicians' housing for the purposes for which it was incorporated. The *Oakwood Hosp I* Court's mention of the nonprofit corporation's "use" of the property was a reference to this Court's holding in *Webb Academy* that housing is exempt only when it is incidental to the use of the entire property for charitable purposes. Further, the Court's discussion of the "use" of property is not inconsistent with our interpretation of the term "occupy." It is certainly consistent for a charitable institution to use property on

18

which it maintains a regular physical presence. Use of property is just one part of occupying it. The two terms are not mutually exclusive; "use" is merely narrower than "occupy."

The dissent would hold that a charitable institution may occupy property by using it without maintaining a physical presence there. Such an interpretation leads to one of the following two unsatisfactory conclusions: (1) a charitable institution can occupy property without actually being physically present or (2) a charitable institution need only use the property sporadically or perhaps even once to occupy it. Neither of these conclusions is consistent with proper meaning of the term "occupy." Rather, a charitable institution must maintain a regular physical presence on the property to occupy the property under MCL 211.7o.

## VI. CONCLUSION

Petitioner did not occupy the real property to qualify for a property-tax exemption under MCL 211.7o(1). Although petitioner owned the housing, it leased the housing to others for their own personal use and had no regular physical presence in the housing. Thus, petitioner did not occupy the housing under the plain language of the statute and this Court's interpretations of the predecessors of MCL 211.7o. Because petitioner cannot satisfy all the requirements of MCL 211.7o(1), it is not entitled to an exemption from property taxes during the tax

19

years at issue.  Accordingly, we affirm the judgment of the Court of Appeals in the

instant case and overrule *Pheasant Ring* to the extent that it is inconsistent with

this opinion.


Maura D. Corrigan
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

STATE OF MICHIGAN

SUPREME COURT

LIBERTY HILL HOUSING
CORPORATION,

Petitioner-Appellant,

v                                                                No. 131531

CITY OF LIVONIA,

Defendant-Appellee.

_____

WEAVER, J. (*concurring in the result only*).

The question before this Court is whether the petitioner is exempt under MCL 211.7o(1)[1] from paying property tax on property it uses for the charitable purpose of providing housing for low-income families, low-income individuals, and disabled individuals. Specifically, does the petitioner "occupy" the subject property, as the term "occup[y]" is contemplated as a requirement for exemption from property tax under MCL 211.7o(1)?

Pursuant to MCR 7.302(G)(1), in lieu of granting leave to appeal, I concur in affirming the Court of Appeals holding that petitioner did not occupy the

---

[1] MCL 211.7o(1) states: "Real or personal property owned and occupied by a nonprofit charitable institution while occupied by that nonprofit charitable institution solely for the purposes for which that nonprofit charitable institution was incorporated is exempt from the collection of taxes under this act."

(continued…)

subject property as contemplated under MCL 211.7o(1), and I agree with overruling *Pheasant Ring v Waterford Twp*, 272 Mich App 436; 726 NW2d 741 (2006), but would overrule it to the extent that its holding is inconsistent with my opinion.

## I. FACTS

Petitioner Liberty Hill is a nonprofit organization incorporated under the laws of Michigan. Petitioner's charitable purpose is to provide housing for low-income or disabled individuals, in addition to low-income families. The tenants of the property at issue lease the housing under traditional landlord-tenant agreements. Petitioner collects rent from the tenants, charges late fees when the deadline for rent passes, and requires security deposits.

Petitioner requested a tax exemption from respondent city of Livonia for tax years 2003 and 2004, arguing that it qualified for exemption as a charitable organization occupying property in furtherance of its charitable purpose. The case was heard in the Michigan Tax Tribunal (MTT), which denied petitioner's request for an exemption. Petitioner appealed in the Court of Appeals, which affirmed the MTT's ruling in an unpublished opinion per curiam.[2] Petitioner then sought leave to appeal in this Court.

_____

(…continued)

[2] *Liberty Hill Housing Corp v City of Livonia*, unpublished opinion per curiam of the Court of Appeals, issued May 16, 2006 (Docket No. 258752).

While the application for leave to appeal in the instant case was pending, the Court of Appeals issued a published opinion in *Pheasant Ring v Waterford Twp*. The petitioner in *Pheasant Ring* was a nonprofit organization, similar to petitioner in this case, that leased housing to persons with autism under a traditional landlord-tenant agreement. The petitioner in *Pheasant Ring* requested a property-tax exemption under MCL 211.7o(1). In *Pheasant Ring*, the Court of Appeals held that the petitioner did "occupy" the property in a manner that qualified for the exemption. The decision was not appealed in this Court.

To clarify whether a charitable organization that leases property to others as part of its charitable purpose "occupies" the property under MCL 211.7o(1), this Court ordered oral argument on the application, directing the parties to address "whether *Pheasant Ring v Waterford Twp* . . . was correctly decided."[3]

## II. STANDARD OF REVIEW

Questions of statutory construction are reviewed de novo. *Grimes v Dep't of Transportation,* 475 Mich 72, 76; 715 NW2d 275 (2006). "'[E]xemption statutes are to be strictly construed in favor of the taxing unit.'" *Ladies Literary Club v Grand Rapids*, 409 Mich 748, 753; 298 NW2d 422 (1980) (citation omitted).

---

[3] *Liberty Hill Housing Corp v City of Livonia*, 477 Mich 1018 (2007).

## III. ANALYSIS

To qualify for an exemption under the text of MCL 211.7o(1), the claimant must satisfy a three-part test: (1) the real estate must be owned and *occupied* by the exemption claimant, (2) the exemption claimant must be a nonprofit charitable institution incorporated under the laws of this state, and (3) the buildings and other property thereon must be *occupied* by the claimant solely for the purposes for which it is incorporated. *Wexford Med Group v City of Cadillac*, 474 Mich 192, 203; 713 NW2d 734 (2006). The issue in common between *Pheasant Ring* and the instant case is whether the petitioners "occupied" their respective properties in a manner that meets the first and third elements of the exemption test. In both cases, the properties were leased as housing to tenants with special needs.

With regard to the petitioner in this case, the Court of Appeals held that petitioner did not occupy the property because it had leased the property to tenants and had thus given up its right to occupy the property. The Court of Appeals in *Pheasant Ring*, on the other hand, criticized that argument as being "too narrow and restrictive." *Pheasant Ring*, 272 Mich App at 442. The *Pheasant Ring* panel then went on to hold that, because the petitioner had *used* the property in furtherance of its charitable purpose, it had occupied the property for the charitable purpose. *Id*.

I agree with the Court of Appeals in the instant case, and further conclude that the *Pheasant Ring* panel incorrectly interpreted the term "occupied" to mean "used." I note that long-established law requires this Court to give a narrow

4

construction to statutes creating tax exemptions. *Ladies Literary Club*, 409 Mich at 753. I interpret the term "occupied" in the narrowest sense, looking only at the language used in MCL 211.7o(1). The statute requires a claimant to perform two actions before a charitable exemption can be granted: (1) the charitable organization must own the property and (2) the charitable organization must occupy the property.[4] The statute makes the occupancy requirement distinct from the ownership requirement, and it makes no mention of "using" the property. Thus, I reject the *Pheasant Ring* interpretation that "using" the property is equivalent to occupying the property because that interpretation goes beyond the text of the statute. Given the statute's use of the term "occupied," a claimant must, at a minimum, have occupancy rights to the property before it can qualify as having "occupied" that property.

By leasing the property to tenants, the petitioner in this case gave up its right to occupy the property during the term of the lease. Because petitioner could not occupy the property by reason of its own agreement, it cannot now claim that it "occupied" the property for purposes of MCL 211.7o(1). The tenants were the only occupants of the property during the tax years at issue.

---

[4] The occupation must be in furtherance of the organization's charitable purpose.

5

IV.  CONCLUSION

Petitioner did not occupy the property at issue during tax years 2003 and 2004 because petitioner had contracted away its occupancy rights in the form of lease agreements.  Thus, petitioner cannot satisfy the requirements of MCL 211.7o(1) for exemption from property taxes for tax years 2003 and 2004.

Accordingly, I concur with the majority in affirming the Court of Appeals holding in the instant case and overruling the Court of Appeals opinion in *Pheasant Ring v Waterford Twp*, but would overrule it to the extent that it is inconsistent with my opinion.


Elizabeth A. Weaver

S T A T E   O F   M I C H I G A N

SUPREME COURT

LIBERTY HILL HOUSING
CORPORATION,

        Petitioner-Appellant,

v                                      No. 131531

CITY OF LIVONIA,

        Respondent-Appellee.

_____

CAVANAGH, J. (*dissenting*).

I dissent from the majority opinion, which holds that Liberty Hill Housing Corporation, a nonprofit organization that leases housing to disabled or low-income individuals, did not qualify for the charitable-institution property-tax exemption under MCL 211.7o(1) because it did not occupy the properties at issue. I disagree that the Legislature intended the term "occupy," as used in MCL 211.7o(1), to mean "reside in or on" or "to be a resident or tenant of; dwell in." This cannot be the meaning intended by the Legislature because it is inconsistent with the statute's subsequent use of the term and the statute's purpose.

The key issue in this case is the meaning of the term "occupied" as it is used in MCL 211.7o(1), which exempts from taxation "[r]eal or personal property owned and occupied by a nonprofit charitable institution . . . ." The majority opinion rejects the definition of "occupied" that denotes ownership, "to have, hold,

. . . possess, . . . or claim," reasoning that the term "occupied" must mean something other than ownership because MCL 211.7o(1) uses the conjunctive phrase "owned *and* occupied." *Ante* at 13-14. But there are several definitions for the term, so ruling out the meaning that denotes ownership only eliminates one alternative. The entire entry for the term "occupy" in the dictionary used by the majority opinion suggests six different meanings:

> —*v.t.* 1. to have, hold, or take as a separate space; possess, reside in or on, or claim: *The orchard occupies half the farm.* 2. to be a resident or tenant of; dwell in. 3. to fill up, employ, or engage: *to occupy time reading.* 4. to engage or employ the mind, energy, or attention of: *We occupied the children with a game.* 5. to take possession and control of (a place), as by military invasion. —*v.i.* 6. to take or hold possession. [*Webster's Universal College Dictionary* (1997).]

Moreover, consulting a different dictionary yields additional variations of the definition, illustrating a hazard of singularly employing dictionary definitions to discern legislative intent. For example, Black's Law Dictionary (8th ed) articulates one definition of "occupancy" as "the use to which property is put," which bears some relation to the third *Webster's* definition: "to fill up, employ, or engage."[1] The majority cursorily dismisses three of the alternative *Webster's*

---

[1] The other four alternative definitions include:

> 1. The act, state, or condition of holding, possessing, or residing in or on something; actual possession, residence, or tenancy, [especially] of a dwelling or land. . . . 2. The act of taking possession of something that has no owner (such as abandoned property) so as to acquire legal ownership. . . . 3. The period or term during which one owns, rents, or otherwise occupies property.
> (continued…)

2

definitions as "clearly not relevant," but accuses me of selectively quoting from Black's Law Dictionary. *Ante* at 13, 16. However, I have not presented alternative dictionary definitions to argue that "my" dictionary is more authoritative than the majority's dictionary; rather, I raise them to draw attention to the inadequacy of a dictionary-driven approach to statutory interpretation. The practice of reaching for a dictionary to define common words in a statute risks serving to merely confirm the writer's assumed meaning of the word, rather than to actually advance the writer's legal analysis.[2] While dictionaries are certainly useful tools of statutory interpretation, there are circumstances in which consulting a dictionary will not itself resolve the proper meaning of a statutory word or phrase.

This case presents such a circumstance—in which consulting dictionaries yields a number of possible meanings of the term "occupied." As a result, discerning the most appropriate meaning requires further analysis. Several principles of statutory construction aid in determining how the term "occupied" should be understood in MCL 211.7o(1). A phrase must be construed in light of the phrases around it, not out of context. *Koontz v Ameritech Services, Inc*, 466

---

(…continued)
> 4.The state or condition of being occupied. [Black's Law Dictionary (8th ed).]

[2] See Hoffman, *Parse the sentence first: Curbing the urge to resort to the dictionary when interpreting legal texts*, 6 NYU J Legis & Pub Pol'y 401 (2003).

Mich 304, 318; 645 NW2d 34 (2002). Similarly, when construing a statute, a court must read it as a whole. *G C Timmis & Co v Guardian Alarm Co*, 468 Mich 416, 421; 662 NW2d 710 (2003). Particularly relevant here is the commonsense principle that "'"[i]dentical language should certainly receive identical construction when found in the same act."'" *Empire Iron Mining Partnership v Orhanen*, 455 Mich 410, 426 n 16; 565 NW2d 844 (1997), quoting *Tryc v Michigan Veterans' Facility*, 451 Mich 129, 155; 545 NW2d 642 (1996) (Riley, J., dissenting).

When a statute repeats terms, it is logical to infer that they have the same meaning in each instance. The statute at issue here uses the term "occupied" twice within the same sentence: "Real or personal property owned and *occupied* by a nonprofit charitable institution while *occupied* by that nonprofit charitable institution solely for the purposes for which that nonprofit charitable institution was incorporated is exempt from the collection of taxes under this act." MCL 211.7o(1) (emphasis added). The statute's two uses of the term "occupied" should be consistent in meaning. But interpreting "occupied" to relate to residency, as the majority opinion suggests, is incongruous with the statute's second use of the term "occupied." That interpretation would require that an institution resided in property solely for a particular purpose. One's residency of property does not commonly have any purpose other than residency, or dwelling, itself. By contrast, the *use* of property might be for a particular purpose. It would be entirely appropriate to state that an institution used property solely for a particular purpose,

4

such as a medical, educational, or recreational purpose. The second instance of "occupied" should be understood as synonymous with "used," because it is the most appropriate definition for that context. Interpreting "occupied" to relate to use would also be appropriate for the first instance of the term, which confirms that the Legislature intended this meaning.

Additionally, interpreting "occupied" as synonymous with "used" comports with the function of the statute, whereas interpreting "occupied" to relate to residency does not. The exemption described in MCL 211.7o(1) applies only to nonprofit charitable institutions; it never applies to individuals. Applying the term "reside" to an institution is a strained and odd interpretation. Unlike people, institutions are inanimate and do not typically reside in a place. Notably, the majority articulates the following definition of "reside" from *Webster's*: "1. to dwell permanently or for a considerable time; live. 2. (of things, qualities, etc.) to be present habitually; be inherent ([usually followed] by *in*)." *Ante* at 15. The first definition of "reside" clearly does not apply to institutions, because institutions do not dwell or live anywhere. The second definition of "reside" does not apply because an institution would not be inherent in a particular piece of property.

Further, the statute applies broadly to "real or personal" property, not simply residential property. Not all property that is eligible for exemption is susceptible to being resided in. For example, if a nonprofit charitable institution owned land that contained a swimming pool, it would be inapt to state that the

5

institution occupied the swimming pool in that it resided in the pool. But it would be entirely appropriate to state that the institution occupied the swimming pool in that it operated the pool and, further, that it operated the pool in fulfillment of its charitable purpose.[3] Thus, the term "occupied" must be construed so that it applies to the broad range of property that could be exempt under MCL 211.7o(1).

Finally, Michigan caselaw supports interpreting the term "occupied" to mean "used" in the context of this exemption. In *Oakwood Hosp Corp v State Tax Comm*, 374 Mich 524; 132 NW2d 634 (1965), the predecessor of MCL 211.7o was at issue. The statute exempted from taxation property that was "owned and occupied" by "library, benevolent, charitable, educational or scientific institutions . . . while occupied by them solely for the purposes for which they were incorporated." *Id*. at 528. This Court held that houses owned by the plaintiff hospital, which were used for dwelling purposes for resident physicians and their families, were exempt under this provision. *Id*. at 530-532. The hospital charged the residents $100 a month to defray the cost of the housing, which was located at the edge of the hospital property and fronted a public street in a residential neighborhood. This Court reasoned that the houses were built to be necessary accessories to the hospital, because there was a shortage of housing close to the

--------

[3] Despite its devotion to the dictionary, the majority departs from its chosen definition when it is convenient or necessary to do so, such as in the swimming-pool hypothetical. The shortcomings of its chosen dictionary definition lead the majority to craft its own definition of "occupy"—to maintain a regular physical presence. *Ante* at 18.

hospital and the resident physicians needed to be available to serve at the hospital on short notice. *Id*. at 527. It concluded that "[t]he houses are *used* as part of the hospital operation and are incidental thereto. Exemption under the statute applies." *Id*. at 532 (emphasis added).[4] Clearly, *Oakwood* interpreted the term "occupied" to mean the use of the property. The focus in *Oakwood* was not simply who physically "resided in" the property, but whether the *use* of the property was within the hospital's scientific purpose. This Court viewed the resident physicians as an extension of the hospital because they were so integral to the hospital's purpose; accordingly, their tenancy and use of the housing was attributed to the hospital.

Therefore, if the term "occupied" is understood to relate to the use to which property is put, the question here is whether Liberty Hill occupied the properties when it leased them to these particular tenants. The relationship between Liberty Hill and its tenants is analogous to the relationship between the hospital and the medical residents in *Oakwood*. A hospital's narrow purpose is to provide medical care *at the hospital*, but *Oakwood* recognized that enabling medical residents to get to the hospital quickly was necessary to that purpose. Accordingly, even though actual medical care did not occur in the houses, the relationships between

---

[4] The majority's argument that *Oakwood* and the other cases addressing this exemption did not concern the "owned and occupied" element of the exemption statute is irrelevant because the term "occupied" should have the same meaning in both instances in the statute.

7

the medical residents, their housing, and the hospital were so intertwined that this Court regarded housing the medical residents as an operation of the hospital that was within its scientific purpose. The fundamental purpose of Liberty Hill is to enable low-income or disabled people to live independently, rather than in institutions or group homes. The physical manifestation of Liberty Hill's operations is not just its central office, but also in having Liberty Hill's tenants occupy the houses. If Liberty Hill's tenants do not live in the houses, Liberty Hill's purpose is not fulfilled.

Further, the tenancy arrangements demonstrate a unique relationship between Liberty Hill and its tenants. All Liberty Hill tenants are referred by Community Living Services, Liberty Hill's parent corporation. Liberty Hill's sample lease appears to be a standard lease, except that it includes a provision that "Community Living Services shall assist the tenant in complying with the terms of this lease." Unlike a standard landlord-tenant relationship, Liberty Hill has specifically agreed to work with the tenant to fulfill the lease requirements. Further, Community Living Services contracts to provide a number of services to Liberty Hill tenants *at the properties*. Support services include transportation, personal-care assistance, support for work, recreation, community involvement, and health-care service. The aid given in a particular tenant's home could amount to care being provided 24 hours a day, seven days a week, depending on the tenant's needs. Thus, between assisting the tenant with complying with the lease

and providing support services, it is clear that Liberty Hill operates in the properties, even though the tenants physically reside in them.

In addition to the services that Liberty Hill provides through Community Living Services, the financial arrangements indicate that Liberty Hill does not have a standard landlord-tenant relationship with its tenants. All of Liberty Hill's tenants qualify for Supplemental Security Income, which amounts to approximately $600 a month and is usually the only source of income for each tenant. Tenants pay no more than one-third of their income to rent, usually about $200 a month. Liberty Hill receives governmental funds and donations that offset the remainder of the housing-related expenses, such as the mortgage, insurance, and maintenance. But in four of the last five years, Liberty Hill has operated at a deficit. The financial circumstances indicate that Liberty Hill is not leasing the houses as a typical landlord, but is leasing the houses as an integral part of its mission. Just as the houses in *Oakwood* would not have been exempted from taxation if they had been rented to people unrelated to the hospital, the Liberty Hill houses would not be exempt if they were rented to tenants who were not referred by Community Living Services and who did not meet Liberty Hill's criteria.

Leasing the properties to particular low-income or disabled tenants and maintaining a relationship with them was integral to Liberty Hill's operation. Thus, Liberty Hill occupied the properties within the meaning of MCL 211.7o(1) because it used the properties as part of its institutional mission. Moreover, it occupied the properties solely for the purposes for which it was incorporated, as

required by MCL 211.7o(1).  I would reverse the judgment of the Court of Appeals.

Michael F. Cavanagh
Marilyn Kelly